IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

YVONNE MESTRE,          and
MICHAEL MANAHAN,

                  Plaintiffs,          Case No. CV 04-442 MO

      v.          OPINION AND ORDER

VIVENDI UNIVERSAL US HOLDING CO.,
et. al.,

                  Defendants.

---

**MOSMAN, J.,**

Plaintiff's screenplay "The Sunday Hat" is set in Europe in the 1950s and is a story of a

young girl who is introduced to formal ballet lessons by her friend and is able to fulfill her dream

of becoming a ballet dancer.  Defendant's screenplay  "Billy Elliot" is set in Northeast England

during the 1984 coal miners' strike and is about a young adolescent boy who discovers ballet by

mere coincidence and is eventually accepted to the Royal School of Ballet.

This is an action asserting copyright infringement under 17 U.S.C. § 101 et seq. and

breach of an implied-in-fact contract under state law based on defendants' alleged unlawful

copying of "The Sunday Hat."  Defendants' move for summary judgment on all of plaintiffs'

claims.  For the reasons which follow, defendants' motion is GRANTED and plaintiffs'

complaint is DISMISSED in its entirety.

PAGE 1 - OPINION AND ORDER

## I.	BACKGROUND

In August 1989, plaintiff Mestre moved to California with the goal of breaking into the film industry as a director.  In an attempt to do so, Mestre wrote a screenplay of her childhood story; a story of a poor child with the unlikely ambition of becoming a ballet dancer.  Plaintiff Manahan assisted Mestre with editing and efforts to secure financing to produce the film.  Plaintiffs entitled their original screenplay "Yanne."  While pursuing financing to produce their film, plaintiffs allege that they provided Pippa Hall with a more recent version of their original screenplay entitled "The Sunday Hat" at a meeting in California.

In 1991, plaintiffs' original screenplay "Yanne" was deposited with the Copyright Office and received Copyright Registration No. PAu 1 573 822.  In 1992, plaintiffs supplementally registered their original screenplay with the Copyright Office under other titles including "The Sunday Hat."  At that time, plaintiffs received Copyright Registration No. PAu 1 658 545.  On April 6, 2005, pursuant to this action, plaintiffs received a letter from the Copyright Office informing them that the Copyright Office had misplaced or misfiled plaintiffs' original screenplay "Yanne."  In the same letter, the Copyright Office also informed plaintiffs that no deposit of their supplementally registered work under number PAu 1 658 545 was available because Copyright Office regulations do not permit copies or supporting documents to be made part of the record for supplementary registrations.

The motion picture "Billy Elliot" is based on the screenplay "Dancer," which was largely written by Lee Hall from late 1995 through 1997.  In 1997, Hall submitted his screenplay "Dancer" to Tiger Aspect Productions in London, England.  Tiger Aspect helped Hall revise his screenplay and secured financing for production.  On March 1, 1999, Jina Jay, casting director

PAGE 2 - OPINION AND ORDER

for "Billy Elliot," hired Pippa Hall to cast the male child actor to play Billy Elliot. Pippa Hall was introduced to Lee Hall after being hired as a casting associate.

On March 26, 2004, plaintiffs filed this action alleging copyright infringement under 17 U.S.C. § 101 et seq., unfair competition under 15 U.S.C. §§ 1117 and 1125(a), and breach of an implied-in-fact contract under state law. On May 6, 2004, plaintiffs filed their first amended complaint which deleted the unfair competition claim as well as the request for punitive damages under the Copyright Act. Plaintiffs seek monetary damages, declaratory relief, and an injunction for the alleged violations.

Defendants now move for summary judgment on all of plaintiffs' claims.

## II.      DISCUSSION

### A.      Standard for Summary Judgment

A motion for summary judgment is a procedure which terminates, without a trial, actions in which "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

A summary judgment motion may be made in reliance upon "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any." Id. The movant is entitled to summary judgment if the non-moving party, who bears the burden of persuasion, fails to designate "specific facts showing that there is a genuine issue for trial." Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(e)). Thus, in order to preclude a grant of summary judgment, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).

PAGE 3 - OPINION AND ORDER

The substantive law defines which facts are material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The court does not weigh the evidence or make credibility determinations; rather, the court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. Id. at 252. All justifiable inferences must be viewed in the light most favorable to the non-moving party. County of Tuolumne v. Sonora Cmty. Hosp., 236 F.3d 1148, 1154 (9th Cir. 2001) (citing Matsushita, 475 U.S. at 587). Although the non-moving party may bear some burden of persuasion, the party moving for summary judgment bears the initial burden of showing the absence of a genuine issue of material fact. Metro Indus., Inc. v. Sammi Corp., 82 F.3d 839, 847 (9th Cir. 1996). That burden is met by showing an absence of evidence to support the non-moving party's case. Celotex Corp., 477 U.S. at 325.

**B.      Copyright Infringement Claim**

To establish a copyright infringement claim, a plaintiff must establish (1) ownership of the work in question and (2) copying of protected portions of that work by the defendant or the person who composed the defendant's work. Feist Publications, Inc. v. Rural Telephone Service Co., 499 U.S. 340, 361 (1991); Kouf v. Walt Disney Pictures & Television, 16 F.3d 1042, 1044 n.2 (9th Cir. 1994); Cavalier v. Random House, Inc., 297 F.3d 815, 822 (9th Cir. 2002); Brown Bag Software v. Symantec Corp., 960 F.2d 1465, 1472 (9th Cir. 1992). Typically, it is not possible to prove direct copying. A plaintiff may establish this element circumstantially by showing defendant's access to the plaintiff's work and substantial similarity of both the general ideas and the expression of those ideas between the plaintiffs' original copyrighted work and the defendant's allegedly infringing work. Id.; see also Meta Film Assoc., Inc. v. MCA, Inc., 586

F.Supp. 1346, 1355 (C.D. Cal. 1984).

For purposes of this motion, defendants concede that plaintiffs hold a valid U.S. copyright for the work in question.

## 1. Access

Access is proven when the plaintiff demonstrates that the defendant had an opportunity to view or to copy the plaintiff's work prior to the creation of the allegedly infringing work. Three Boys Music Corp. v. Bolton, 212 F.3d 477, 482 (9th Cir. 2000); Weygand v. CBS Inc., 43 U.S.P.Q.2d 1120, 1123 (C.D. Cal. 1997); Baxter, 812 F.2d at 423; Sid & Marty Krofft v. Television Prod., Inc. v. McDonald's Corp., 562 F.2d 1157, 1162 (9th Cir. 1977); Meta Film, 586 F.Supp. at 1355. In order to satisfy this standard, a plaintiff must show more than that the defendant had a "bare possibility" of access. Id. A plaintiff must demonstrate that the defendant had a "reasonable possibility" to view or copy the plaintiff's work. Id.

Circumstantial evidence of reasonable access is proven by either: (1) the wide dissemination of plaintiff's work, or (2) establishing a particular chain of events linking the plaintiff's work and the defendant's access to that work such as by a third-party intermediary. Three Boys, 212 F.3d at 482 citing 4 Nimmer, § 13.02[A] at 13-21; Meta Film, 586 F.Supp. at 1355.

### a. Wide Dissemination

Plaintiffs assert that the approximately 211 individuals who received a copy of their screenplay constitute wide dissemination. (Pls.' Mem. in Opp. to Mot. for Summ. J. at 21.) Plaintiffs provided a limited list of individuals or organizations who received their screenplay,

PAGE 5 - OPINION AND ORDER

(Pls.' Mem. in Opp. to Mot. for Summ. J. Ex. 200), and describe them as "extremely well-connected in the film industry."  (Pls.' Mem. in Opp. to Mot. for Summ. J. at 21.)

An examination of <u>Jason v. Fonda</u>, 698 F.2d 966 (9th Cir. 1982) <u>affirming</u> 526 F.Supp. 774 (C.D. Cal. 1981), provides a helpful guide in determining wide dissemination within the Ninth Circuit.  In its opinion, the Ninth Circuit incorporated the district court's opinion by reference.  698 F.2d at 967.   In <u>Jason</u>, plaintiff printed approximately 1100 copies of her book. <u>Jason</u>, 526 F.Supp. at 776.  Half of these copies were sold by a representative in the New Jersey area.  <u>Id.</u>  Plaintiff also sold approximately 100 through her church and sold another 200-700 copies through booksellers in Southern California.  <u>Id.</u>  Plaintiff also alleged a series of transmittals of her book within United Artists and NBC, two of the alleged infringers, during the time of production of the allegedly infringing film.  <u>Id.</u>

The district court held that this level of dissemination did not create a reasonable inference of access.  <u>Id.</u> at 777.  The court reasoned that the evidence presented showed no more than a bare possibility that any of the defendants involved in the production of the allegedly infringing film had access to plaintiff's book prior to or during the production of the film aside from those available at various bookstores in Southern California.  <u>Id.</u>  The court reasoned further that "such a bare possibility is insufficient to create a genuine issue of whether defendants copied plaintiff's book."  <u>Id.</u>

A look at other circuits also provides guidance concerning the requirements to establish an inference of access through wide dissemination.  The Second Circuit has defined wide dissemination as requiring considerable commercial success or being readily available in the

market.[1]  The Seventh Circuit also requires considerable public dissemination to infer access.[2]

In reviewing the leading cases on wide dissemination in both the Second and Seventh Circuits, a district court in Minnesota formulated the following considerations when determining widespread dissemination: (1) number of copies distributed; (2) commercial success or notoriety; and (3) national performances or distribution.  Hoch v. Mastercard Int'l Inc., 284 F.Supp.2d 1217, 1220 (2003).

As applied to this case with all inferences drawn in light most favorable to plaintiffs, plaintiffs fail to establish a reasonable inference of wide dissemination of "The Sunday Hat." Plaintiffs distributed approximately 211 copies of "The Sunday Hat," gained no commercial success or notoriety, and do not establish a regional, national, or an international distribution of the screenplay.  See Hoch, 284 F.Supp.2d at 1220; Jason, 526 F.Supp. at 776; see also Rice v. Fox Broad. Inc., 330 F.3d 1170 (9th Cir. 2003) (distribution of 17,000 videos over the course of 13 years did not constitute wide dissemination); Three Boys, 212 F.3d at 482 (wide dissemination found where song was distributed through radio, television in the Northeastern United States).

As in Jason, plaintiffs urge this court to find wide dissemination based on a series of

---

[1]  See ABKCO Music, Inc. v. Harrisongs Music, Ltd., 722 F.2d 988 (2d Cir. 1983) (song was a number one hit in the U.S. and England); Silberstein v. Fox Entm't Group, Inc., 2004 WL 1620895 (S.D.N.Y. July 19, 2004) (no inference of access where plaintiff provided no evidence of commercial success); Acuff-Rose Music, Inc. v. Jostens, Inc., 988 F.Supp. 289 (S.D.N.Y. 1987) (wide dissemination found because country song was a top-five hit).

[2] Selle v. Gibb, 741 F.2d 896 (7th Cir. 1984) (finding no reasonable inference of access where song was briefly disseminated regionally and was only sent to eleven recording companies several of which returned the materials).

tenuous inferences that several individuals within the film industry may have received their screenplay and could conceivably have passed it on to Lee Hall, the creator of the allegedly infringing work. (Pls.' Mem. in Opp. to Mot. for Summ. J. at 30.) This argument creates only a "bare possibility" that defendants had access to plaintiffs' screenplay "The Sunday Hat," which is insufficient to create a genuine issue of whether defendants copied plaintiff's book. See Three Boys, 212 F.3d at 482; Jason, 526 F.Supp. at 777; see also Hoch, 284 F.Supp.2d at 1220. As such, plaintiffs fail to create any reasonable inference that Lee Hall came across their screenplay before his independent creation. Id.

### b. Third-Party Intermediary

A reasonable possibility of access may also be established through a third-party intermediary if the nexus between the defendant and the individual possessing knowledge of plaintiff's work is sufficiently strong. Meta Film, 586 F.Supp. at 1355. The nexus is sufficiently strong to demonstrate a reasonable possibility of access when the third-party intermediary, "the person who had viewed plaintiff's work and was therefore in a position to transmit it to the copier, either was a supervisor with responsibility for the defendant's project, was part of the same work unit as the copier, or contributed creative ideas or material to the defendant's work." Id.; see also Weygand, 43 U.S.P.Q.2d at 1123 (alleged infringer and intermediary occupy positions that naturally allow the possessed information to be imparted to the other).

At a minimum, establishing a reasonable possibility of access through a third-party intermediary requires that "the dealings between the plaintiff and the intermediary and between the intermediary and the alleged copier must involve some overlap in subject matter to permit an inference of access." Meta Film, 586 F.Supp. at 1358.

Plaintiffs assert that a reasonable possibility of access may be inferred through two third-party intermediaries, Howard Burch and Pippa Hall. (Pls.' Mem. in Opp. to Mot. for Summ. J. at 23-36.)

Concerning Howard Burch, plaintiffs allege a string of hypothetical transmittals connecting the submission of their screenplay "The Sunday Hat" to Lee Hall. (Pls.' Mem. in Opp. to Mot. for Summ. J. at 28-30.) Plaintiffs contend that they submitted their screenplay to Angeli MacFarlane at First Film Foundation in England. In June 1995, Burch, who was also affiliated with First Film Foundation at that time, participated in a writers' lab as a guest speaker. Lee Hall also attended the writers' lab. Burch gave a ten minute presentation describing how First Film Foundation worked. (Howard Burch Decl. ¶¶ 7-8.)

No evidence beyond mere speculation or conjecture suggests that Burch ever saw plaintiffs' screenplay prior to the writers' lab or discussed it with Lee Hall at the writers' lab. Plaintiffs fail to show any overlap in subject matter at issue in this case between Burch and Lee Hall let alone that Burch creatively contributed to Lee Hall's ideas or material for "Dancer." See Meta Film, 586 F.Supp. at 1358; see also Weygand, 43 U.S.P.Q.2d at 1123. Showing that Angeli MacFarlane at First Film Foundation had knowledge of their screenplay does not establish a nexus sufficiently strong to allow a reasonable possibility of access through Burch. Id.

Regarding Pippa Hall as a third-party intermediary, disputed facts exist as to whether she received plaintiffs' screenplay "The Sunday Hat." The court therefore assumes, for purposes of

summary judgment, that Pippa Hall received some embodiment[3] of the screenplay in March of

1999. However, these facts alone are not sufficient to withstand summary judgment on the issue

of access. Construing these facts in a light most favorable to plaintiffs, plaintiffs still must show

a nexus between Pippa Hall and Lee Hall prior to Lee Hall's creation of his screenplay "Dancer."

See Meta Film, 586 F.Supp. at1355; see also Weygand, 43 U.S.P.Q.2d at 1123. In other words,

there must be a connecting link allowing for a reasonable inference that Pippa Hall creatively

contributed to Lee Hall's screenplay. Id.

In reliance upon Kamar Int'l, Inc. Russ Berrie and Co., 657 F.2d 1059, 1062 (9th Cir.

1981), plaintiffs argue the fact that Pippa Hall worked on "Billy Elliot" as a casting associate is

sufficient to establish access to their screenplay by Lee Hall. The instant case, however, is

distinguishable. In Kamar, plaintiffs established that the dealings between the parties occurred

prior to and during the alleged infringement. Id. Plaintiffs have made no such showing in this

case.

It is undisputed that Pippa Hall's first known contact with Lee Hall occurred in March of

1999 after his script was largely formed and production on the movie "Billy Elliot" had begun.

See Meta Film, 586 F.Supp. at 1355; see also Weygand, 43 U.S.P.Q.2d at 1123. Although Pippa

Hall's role as a casting associate does establish an overlap in subject matter, this alleged nexus

occurs too late in the creative process to provide defendants with access to plaintiffs' screenplay

---

[3]At oral argument, plaintiffs assert that Pippa Hall received a copy of a short promotional of "The Sunday Hat" and not the actual written screenplay. Normally, this would be fatal to their argument for access via Pippa Hall. But because plaintiffs elsewhere allege delivery of a screenplay, and because plaintiffs are pro se, the court construes the promotional film to embody the written screenplay.

PAGE 10 - OPINION AND ORDER

before the script of "Billy Elliot" was largely completed.  Id.

Accordingly, plaintiffs fail to establish a genuine issue of access through Howard Burch

or Pippa Hall beyond mere speculation and conjecture.

Without proof of access plaintiffs' claims fail unless they can show that "The Sunday

Hat" and "Billy Elliot" are "not only substantially similar, but are so strikingly similar as to

preclude the possibility of independent creation."  See Meta Film, 586 F.Supp. at 1355 citing 3

Nimmer on Copyright § 13.01[B]; see also Baxter v. MCA, Inc., 812 F.2d 421, 423 n.2 (9th Cir.

1987).

### 2.  Substantial Similarity

The courts apply a two-part analysis, an extrinsic test and an intrinsic test, to determine

whether the ideas and the expression of those ideas are substantially similar in two works.  Kouf,

16 F.3d at 1045.

The extrinsic test is objective and focuses on "specific, articulable similarities between

the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events" in the two

works.  Berkic v. Crichton, 761 F.2d 1289, 1292 (9th Cir. 1985) citing Lichtfield v. Spielberg,

736 F.2d 1352, 1356-57 (9th Cir. 1984); see also Smith v. Jackson, 84 F.3d 1213, 1218 (9th Cir.

1996); Kouf 16 F.3d at 1045.

Because general plot ideas are not protected by copyright law, the court must look

beyond the general plot and compare the actual concrete elements that make up the total

sequence of events and the major relationships between the main characters of the two works.

Berkic, 761 F.3d at 1293.  Generally, it is the expression of ideas that receive protection and not

the ideas themselves.  Rice v. Fox Broadcasting Co., 330 F.3d 1170, 1175 (9th Cir. 2003) citing

PAGE 11 - OPINION AND ORDER

Metcalf v. Bochco, 294 F.3d 1069, 1074 (9th Cir. 2002). "Similarities derived from the use of common ideas cannot be protected; otherwise, the first to come up with an idea will corner the market." Apple Computer, Inc. v. Microsoft Corp., 35 F.3d 1435, 1443 (9th Cir. 1994).

The intrinsic test is a subjective test used to determine whether two works are substantially similar in their forms of expression. Berkic, 761 F.2d at 1292. This test focuses on "whether the ordinary, reasonable audience would recognize the defendant's work as a 'dramatization' or 'picturization' of the plaintiff's work." Id. quoting Lichtfield, 736 F.2d at 1357.

For summary judgment purposes, only the extrinsic test is important, and a plaintiff avoids summary judgment by satisfying the extrinsic test which makes the similarity of the works a triable issue. Jackson, 294 F.3d at 1218; Kouf, 16 F.3d at 1045; Brown Bag, 960 F.2d at 1477. Conversely, a plaintiff who cannot satisfy the extrinsic test necessarily loses on summary judgment because a jury may not find substantial similarity without evidence on both the extrinsic and intrinsic tests. Id. However, if the plaintiff satisfies the extrinsic test, the subjective inquiry of the intrinsic test must be left to the jury and summary judgment must be denied. Id.

Before proceeding to the merits of substantial similarity analysis, the court must resolve issues created by the Copyright Office's misplacement and, therefore, unavailability of plaintiffs' original screenplay deposited with the Copyright Office. This set of circumstances invokes the best evidence rule and whether the court may compare plaintiffs' proffered version of "The Sunday Hat" with "Billy Elliot" since, in a copyright action, it is the contents of the original works that are material and must be proved. See Data East USA Inc., 862 F.2d 204, 207 (9th Cir. 1988); Seiler v. Lucasfilm, LTD., 808 F.2d 1316, 1320 (9th Cir. 1987).

The court resolves the best evidence rule in favor of plaintiffs because the original script is unavailable through no fault of their own. Furthermore, defendants concede[4] that the proffered version of "The Sunday Hat" is the same, or similar enough for our purposes, to the unavailable copy plaintiffs deposited with the Copyright Office.

Below is a discussion and comparison of the extrinsic test factors as applied to "The Sunday Hat" and "Billy Elliot." At oral argument, plaintiffs also contended that under the "inverse ratio rule" the works are so strikingly similar as to preclude independent creation. This argument is taken up after the court's discussion of the extrinsic test factors.

### Plot/Sequence of Events

Nikki begins her journey as the only child of a poor, divorced immigrant who works several jobs to survive. Nikki struggles in school and is very absent minded. She and her mother both struggle with being completely honest about the past and present. Nikki is eventually befriended by a rich classmate, Anni, who once shunned Nikki but now invites her to ballet class. Nikki slowly begins to participate in ballet class and hides the experience from her mother, who forbids Nikki to take ballet. Nikki is eventually accepted by her fellow ballet classmates, and a boy, Cyril, begins to like her, giving her a kiss at the end of the story.

After a long struggle to keep the ballet lessons and an upcoming performance a secret

---

[4]In their briefing for purposes of substantial similarity, defendants compared "Nikki's Dream," the novelization of "The Sunday Hat," because it was the only available original from the Copyright Office.

Before defendants' concession, plaintiffs argued that such a comparison was incorrect because of differences that exist between "Nikki's Dream" and "The Sunday Hat." For example, the element of coal in "The Sunday Hat" was changed to wood in "Nikki's Dream," and "The Sunday Hat" is set in Europe during the 1950s whereas "Nikki's Dream" has a generic modern cosmopolitan setting.

PAGE 13 - OPINION AND ORDER

from her mother, Nikki's mother discovers the truth and Nikki runs and hides.  She is eventually found and her mother, realizing her daughter's passion and desire for ballet, explains that she was once a ballerina but was unsuccessful and that is why her father left her.  Nikki's mother does not want this same destiny for her child.  Nikki is allowed to pursue ballet as long as she works hard in school.

In contrast to the "The Sunday Hat," the plot of "Billy Elliot" is developed not only through the main characters but by the historical setting of the 1984 coal miners' strike in Northeast England.  Billy begins his journey as the second child of a poor, working class family.  Billy's mother died when he was a small child, and he has been raised by his father and older brother, both striking coal miners.  Billy's grandmother, who claims she could have been a professional dancer, also lives with the family although she is somewhat senile.  Billy discovers ballet while attending boxing lessons.  Both classes occur at the same time and in the same building.  Billy is not very good at boxing and becomes interested in ballet because of his natural desire to dance; however, he is conscious of what his father and others will think of him pursuing ballet and tries to keep it a secret.

As in "The Sunday Hat," Billy's father and brother find out about the ballet instruction and Billy's desire to pursue ballet.  However, Billy's father eventually realizes that Billy does not have to be just like him and his older son.  Billy's father and brother strive to earn enough money to send Billy to audition for the Royal Ballet School.  Billy is eventually accepted and his acceptance to the Royal Ballet School in London symbolizes not only his escape from poverty but also his, the next generation's, escape from what seemed to be an inescapable destiny of working in the coal mines like his father and older brother.

PAGE 14 - OPINION AND ORDER

<u>**Themes**</u>

In "The Sunday Hat," the focus of the theme is seen through the eyes and perspective of Nikki as she learns to cope with poverty, a class system, a determined mother, an absent father, and a lack of faith in god while pursuing her desire to learn ballet. The major themes of "The Sunday Hat" are honesty and friendship - friendship helps Nikki overcome a social class and enter the world of ballet.

"The Sunday Hat" does not show that ballet leads to a better future for Nikki or allow Nikki, the next generation, to escape her mother's impoverished world. In fact, Nikki is forced by her mother to learn an occupation in order to pursue ballet. "The Sunday Hat" does not end with a ballet performance but rather the preparations of going on stage which symbolize the beginning of Nikki's journey in ballet.

In "Billy Elliot," while the story is central to Billy's love of dance/ballet, the story is developed through several different characters including Billy's father, brother, friend, grandmother, dance teacher, and quasi-girlfriend. Central to the theme in "Billy Elliot" is how each character, not only Billy, is able to cope with poverty, broken dreams, despair, a class system, as well as societal roles of gender. Lee Hall uses Billy's desire to pursue ballet as the medium that forces the major characters of the story to face their own struggles and stereotypical societal norms; this does not occur in "The Sunday Hat." Billy's dad, who wants Billy to be just like him and pursue boxing and coal mining, realizes that he must do something to help Billy escape/transcend his surroundings and destined future.

The major themes of "Billy Elliot" are nonconformity, individuality, and sacrifice for the betterment of children. These themes culminate in the final scene, which takes place years later,

PAGE 15 - OPINION AND ORDER

as Billy, a grown man, dances in a ballet observed by his father, older brother, and now openly gay friend. This final scene symbolizes the end of Billy's journey of having escaped poverty and the coal mines through nonconformity.

Social classes play different roles in the two works. In "The Sunday Hat," Nikki strives to be accepted by her friend Anni, who represents the higher social class and the barriers of Nikki's entrance into ballet. Nikki strives to conform in order to be accepted. In "Billy Elliot," Billy's dance teacher does represent a higher social class; however, she -- her social class -- enables Billy to successfully fight conformity and achieve his dreams of dancing. The social class struggle in "Billy Elliot" is restricted to Billy's father and older brother and represents Billy's future. It does not initially prevent Billy from learning ballet as it does for Nikki in "The Sunday Hat."

### Major Characters

In "The Sunday Hat," the major characters are not confronted with their own struggles or dilemmas except for Nikki and her mother. Nikki's mother does not want Nikki to be just like her - a former ballerina without an education, who now struggles to provide for family after a failed career which caused her husband to leave. Nikki's neighbors represent other parental figures who help raise and guide her throughout the story. Mr. Fish represents a caring father figure who provides Nikki with the necessary comfort in times of need. Nikki's friend Anni represents a higher social class and everything Nikki desperately wants to be - a ballerina. Nikki's ballet instructor provides Nikki with the opportunity to learn ballet.

The characters in "Billy Elliot" also play a different role than in "The Sunday Hat." Each major character must struggle with his or her own dilemmas which adds to the overall plot and

PAGE 16 - OPINION AND ORDER

theme of the movie. Billy's father and older brother illustrate the working class struggle and symbolize Billy's future if he is to stay in his hometown. The boxing lessons illustrate Billy's father's desire for Billy to be just like him and conform to societal norms. The ballet instructor, representing the middle class, becomes a mother figure for Billy and helps him prepare to audition for the Royal Ballet School. Although the dance instructor has her own daughter, who fancies Billy, Billy's potential acceptance to the Royal Ballet School represents a final saving grace for her failed career and marriage. Billy's best friend is also learning to cope with being a young gay boy in a masculine driven society.

### Mood/Pace/Dialogue

"The Sunday Hat," as seen through the dialogue, mood, tone, and pace is meant for families/children and is, therefore, light, slow, and soft. There are no violent undertones as in "Billy Elliot."

In "Billy Elliot," the mood, tone, and pace of this screenplay is harsh and confrontational as dictated by the dialogue, the use of boxing, and the confrontations between the striking coal miners and the police and "scabs." The movie garnered an "R" rating for language. These elements are missing from "The Sunday Hat."

Based on a close reading and comparison, the works are not substantially similar in plot, themes, dialogue, mood, pace, characters, and sequence of events. Nor are they substantially similar in the settings - defendants' screenplay is set in rural, northeast England during the 1984 coal miners' strike, and plaintiffs' is set in Europe during the 1950s. The setting of "Billy Elliot" is directly tied to a specific place, time and historical event. "The Sunday Hat," by contrast, is much more generic in its setting.

PAGE 17 - OPINION AND ORDER

As shown above under the extrinsic test, "The Sunday Hat" and "Billy Elliot" are not substantially similar. With this in mind, the court will now address plaintiffs' argument that works in question are so strikingly similar as to preclude independent creation.

Under the "inverse ratio rule," a high degree of similarity is required in order to dispense with proof of access. <u>Shaw v. Lindheim</u>, 919 F.2d 1353, 1361-62 (9th Cir. 1990). The court's finding under the extrinsic test is not to suggest that some similarities do not exist. However, the only substantial similarity between "The Sunday Hat" and "Billy Elliot" is the general idea of a poor child seeking a profession at odds with its upbringing that allows the child to escape poverty. Although similar, this general idea is not protected under copyright law. <u>See</u> <u>Berkic</u>, 761 F.3d at 1293.

At oral argument, plaintiffs also emphasized that the general plot idea combined with the element of coal in each screenplay demonstrates that the works are so strikingly similar as to preclude a need of showing access.

In "The Sunday Hat," Nikki is scared to go to the basement to retrieve coal to use for heat. In "Billy Elliot," the coal miners' strike is central to the theme, plot and sequence of events. As such, the element or use of coal in the two works is completely different. Several contemporary films including "Zoolander," "The Cutting Edge," and "October Sky" have not only used the general plot idea at issue in this case, but "Zoolander" and "October Sky" also involve young men, destined to become coal miners like their fathers, who escape the coal mines through careers that meet their fathers' initial disapproval. Apparently, coal is the preferred symbolic motif of the film industry to represent the working class. Such similarities derived from the use of the common ideas at issue in the instant case, including the element of coal, are

PAGE 18 - OPINION AND ORDER

simply not protected.  See <u>Apple</u>, 35 F.3d at 1443.

Plaintiffs are correct that the "inverse ratio rule" does allow for a weaker showing of access when plaintiffs demonstrate two works are strikingly similar.  See <u>Meta Film</u>, 586 F.Supp. at 1355 <u>citing</u> 3 <u>Nimmer on Copyright</u> § 13.01[B]; <u>see also</u> <u>Baxter</u>, 812 F.2d at 423 n.2. However, plaintiffs have made too weak a showing in this case to invoke the "inverse ratio rule." Again, there are some similarities, but such similarities are not so high as to be considered substantial let alone striking.

## III.    CONCLUSION

Plaintiffs fail to establish a genuine issue of fact that defendants had access to view or copy "The Sunday Hat" prior to the creation of "Billy Elliot."  Furthermore, the court finds under the extrinsic test that no reasonable juror would conclude that "The Sunday Hat" and "Billy Elliot" are substantially similar in plot, theme, dialogue, mood, setting, pace, characters, and sequence of events.  Accordingly, Defendants motions for summary judgment (Doc. #45) is GRANTED, and plaintiffs' case is DISMISSED in its entirety because all of plaintiffs' claims required the establishment of copyright infringement.


IT IS SO ORDERED.

DATED:   Portland, Oregon, August 15, 2005.



 /s/ Michael W. Mosman
MICHAEL W. MOSMAN
United States District Judge



PAGE 19 - OPINION AND ORDER